UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EDMUND OROK EDEM,

                    Plaintiff,

      - against -

ETHIOPIAN AIRLINES ENTERPRISE,
ETHIOPIAN INSURANCE CORPORATION,
ETHIOPIAN GOVERNMENT (FEDERAL
DEMOCRATIC REPUBLIC OF ETHIOPIA),
JOHN AND JANE DOES.

                    Defendants.
-----------------------------------------------------------X

**MEMORANDUM & ORDER**

08 CV 2597 (RJD)(LB)

DEARIE, Chief Judge.

      Plaintiff, no stranger to this Court,[1] brings this *pro se* action against the Federal Democratic Republic of Ethiopia ("Ethiopia"), Ethiopian Insurance Corporation ("EIC"), and Ethiopian Airlines Enterprise ("EAE"), alleging various causes of action arising out of plaintiff's trip to Nigeria via Ethiopia. Plaintiff claims that Ethiopian officials detained him upon his arrival at Addis Ababa, seized $13,600 in cash he was carrying, and prevented him from leaving Ethiopia for 40 days. Plaintiff also claims that EAE is liable for losing his baggage. Defendant Ethiopia moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1); 12(b)(2); 12(b)(3); 12(b)(4); 12(b)(5); and 12(b)(6). Defendants EAE and EIC move to dismiss pursuant to Rules 12(b)(1); 12(b)(2); 12(b)(4); 12(b)(6); and the doctrine of forum non conveniens. For the reasons stated below, all of plaintiff's claims against Ethiopia and EIC are dismissed for lack

---

[1] See Edem v. The State of New York et al., (03-CV-1220); Edem v. World Airways, Inc., et al., (04-CV-0605); Edem v. Northfield Savings Bank et al., (04-CV-0657); Edem v. Spitzer et al., (05-CV-3504). This Court dismissed the complaints filed in the The State of New York, Northfield Savings, and Spitzer cases; the World Airways case was consolidated with a class action that was eventually settled between the parties.

of subject matter jurisdiction. In addition, all of plaintiff's claims against EAE are dismissed except for his claim that EAE lost his baggage. However, the Court finds that to the extent plaintiff has suffered any damages as a result of EAE losing his baggage, his damages are capped at 1,000 Special Drawing Rights, or approximately $1,500.

## BACKGROUND

Plaintiff, a Staten Island resident, alleges that he purchased a ticket from EAE to fly from Newark to Lagos, Nigeria via Addis Ababa, Ethiopia. Am. Compl. ¶ 4. While plaintiff fails to allege any specific dates in his amended complaint, it appears that he commenced this journey on April 30, 2008. EAE/EIC Opp. Br. at 5. Plaintiff alleges that he carried $16,500 in cash, the bulk of which was to be used to "pursue his building project in Nigeria." Am. Compl. ¶ 22. Plaintiff further claims that just prior to his scheduled departure from Addis Ababa airport, an Ethiopian government official inquired about the contents of his pockets. Plaintiff informed him that he was carrying American currency. According to plaintiff, the Ethiopian official escorted him out of the airport through an "illegal route," without processing him through immigration, and requested that he produce the cash. Am. Compl. ¶ 19. Plaintiff presented the official with $14,600 in cash, alleging that the official seized all but $1,000 of that amount, and issued plaintiff a "temporary receipt of custody." Am. Compl. ¶ 19. According to plaintiff, another Ethiopian official told him that he must immediately leave Ethiopia, or he would be shot or otherwise harmed. Am. Compl. ¶ 19. Because plaintiff had been led out of the transit area, his passport already having been stamped on exit, he alleges that Ethiopian immigration officials subsequently forbade him from reentering the terminal and boarding his flight.

Plaintiff claims that Ethiopia "unlawfully detained" him in the country for forty days, and

that he was not allowed to depart until the Nigerian Embassy wrote to the Ethiopian Foreign Ministry and secured plaintiff's release. Am. Compl. ¶ 23. Plaintiff also claims that the Nigerian Embassy intervened on his behalf to retrieve his allegedly seized money, but that an Ethiopian Customs official refused to offer assistance, as the seizure was the result of a "Banking regulation and not a Customs law." Am. Compl. ¶ 19. The same Customs official allegedly told plaintiff that the seizure was final. Id.

Upon his release from Ethiopia, plaintiff traveled to Nigeria in order to retrieve his baggage, which had been sent on to Nigeria without him. Am. Compl. ¶ 24. Plaintiff claims that EAE failed to return his checked baggage. Am. Compl. ¶ 6.

Plaintiff's amended complaint contains thirteen separate causes of action. Against Ethiopia and EAE, he alleges conspiracy, conversion, RICO violations, unjust enrichment, and vicarious liability. Against EAE alone, plaintiff claims "misfeasance," willful misconduct and delay, breach of duty of good faith and fair dealing, detrimental reliance, and negligence. Plaintiff further alleges violations of international laws and treaties against Ethiopia alone. Finally, plaintiff states a single cause of action against EIC, for "Action on Bond."

## DISCUSSION

### I. Subject Matter Jurisdiction

All of the defendants moved to dismiss arguing that the Court lacks subject matter jurisdiction over them because they are foreign sovereigns or an agent of a foreign sovereign. The Foreign Sovereign Immunities Act ("FSIA") "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). Under the FSIA, "a foreign state is presumptively immune

3

from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).

The so-called "commercial activities" exception applies when an "action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

When determining whether or not a foreign sovereign is subject to the commercial activity exception, the central "issue is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce." Republic of Argentina. v. Weltover, Inc., 504 U.S. 607, 614 (1992) (emphasis in original) (internal quotation marks and citations omitted).

The "takings" exception to foreign immunity is satisfied when a plaintiff establishes the following four elements: "(1) that rights in property are at issue; (2) that the property was taken; (3) that the taking was in violation of international law; *and either* (4)(a) that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or (4)(b) that property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." Garb v. Republic of Poland, 440 F.3d 579, 588 (2d Cir. 2006) (quoting 28 U.S.C. § 1605(a)(3) (emphasis in original) (internal quotation marks omitted).

4

Although EAE and EIC are wholly-owned agents of the Ethiopian government, "government instrumentalities are presumed to be distinct and independent from their sovereign and normally are treated as such." Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 251 (2d Cir. 2000). Accordingly, the Court will evaluate the applicability of the FSIA's exceptions separately for each of these three entities.

### A.  *The Federal Democratic Republic of Ethiopia*

Plaintiff argues that both the commercial activity and takings exceptions apply to Ethiopia, therefore establishing the Court's subject matter jurisdiction over this foreign sovereign.

#### 1.  **The Commercial Activity Exception**

"As a threshold step in assessing plaintiffs' reliance on the commercial activity exception, we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims." Garb, 440 F.3d at 586 (internal quotation marks omitted). Plaintiff's allegations against Ethiopia are essentially that its customs officials seized his currency and that its immigration officials refused to allow him to leave the country. Plaintiff does not argue that these acts were themselves commercial in nature, but rather that the Ethiopian government was working in concert with the airline to "lure" plaintiff into an "entrapment scheme through the commercial activity of Ethiopian Airlines." Ethiopia Opp. Br. at 7.

While the Court notes plaintiff's novel attempt to ascribe EAE's commercial activity to the Ethiopian government, Ethiopia's actual alleged conduct – a customs seizure and immigration action – are undoubtedly sovereign in nature. Indeed, the alleged "conduct boils down to abuse of the power of police, . . . and however monstrous such abuse undoubtedly may

5

be, a foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature." Saudi Arabia, 507 U.S. at 361.

Furthermore, the Second Circuit has noted that "[e]xpropriation is a decidedly sovereign – rather than commercial – activity." Garb, 440 F.3d at 586 (citing Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir. 1977)). With regard to the alleged actions of the Ethiopian immigration authorities, courts have also held that foreign "immigration officials' conduct – whether acceptable or not – is sovereign activity immune from the subject matter jurisdiction of the United States under the [FSIA]." Habtemicael v. Saudia, 1995 WL 443940, at *5 (N.D. Ill. July 24, 1995) (internal citations and quotation marks omitted).

The Court therefore finds that the commercial activity exception does not apply to the Ethiopian government in this case.

### 2.   The Takings Exception

Plaintiff also argues that the so-called "takings" or "expropriation" exception applies to the Ethiopian government. In order to establish this exception, one of the two jurisdictional nexus requirements must be satisfied. Zappia, 215 F.3d at 251. Specifically, plaintiff must demonstrate that the property at issue is either "present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or that the property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

Neither jurisdictional nexus is satisfied with regard to Ethiopia. First, the property at issue – the cash brought into Ethiopia by plaintiff and allegedly seized by Ethiopian authorities

on their own soil – is clearly not "present" in the United States. Furthermore, that property is not "owned" by an "agency or instrumentality" of a foreign state. As plaintiff has failed to establish the required elements of the takings exception, it also does not apply.

### 3. Waiver

Finally, plaintiff argues that Ethiopia has waived its foreign immunity explicitly and implicitly, pursuant to 28 U.S.C. § 1605(a)(1), because of its acceptance of several international treaties. There is no basis for plaintiff's bald assertion that Ethiopia has waived its right to sovereign immunity, and the exception does not apply.

Plaintiff has failed to establish that any of the statutorily enumerated exceptions to the FSIA apply to Ethiopia's alleged conduct in this case, and the Court therefore finds that it lacks subject matter jurisdiction with regard to Ethiopia. Accordingly, Ethiopia's motion to dismiss plaintiff's claims for lack of subject matter jurisdiction is granted.

### *B.*   *Ethiopian Insurance Corporation*

EIC, wholly-owned by the Ethiopian government, is also subject to the provisions of the FSIA. See, e.g., In re Terrorist Attacks, 538 F.3d at 82, citing 28 U.S.C. § 1603(a), (b). Plaintiff's only allegations against EIC appear in Count IX of the Amended Complaint, entitled "Action on Bond." Plaintiff alleges that "EIC issued a bond and insurance policy guaranteeing Ethiopian Airlines performance of their obligations and duties to the plaintiff. Ethiopian Airlines failed to warn the plaintiff of the existing rules in Ethiopia thereby failing to perform these obligations." Am. Compl ¶ 62. Plaintiff contends that all of the same exceptions to FSIA that apply to Ethiopia also apply to EIC. The Court does not agree.

The commercial activity exception is inapplicable to EIC, whose only alleged connection

7

with the United States is its insuring of a company, EAE, that does business in the U.S. Moreover, the takings exception does not apply because plaintiff has not alleged a taking by EIC. Finally, there is simply no support for plaintiff's claim that EIC has waived its sovereign immunity, either implicitly or explicitly. Accordingly, the Court lacks subject matter jurisdiction with regard to EIC and plaintiff's claims against EIC are dismissed.

### C. *Ethiopian Airlines Enterprise*

As a corporation wholly-owned by Ethiopia, EAE also qualifies for sovereign immunity. See also Ofikuru v. Nigerian Airlines, Ltd., 670 F. Supp. 89, 91 (S.D.N.Y. 1987) ("[A]n airline may be considered an instrumentality of a foreign state for jurisdictional purposes"). However, because plaintiff's itinerary originated in the United States, and is the type of activity that could be performed equally well by a private party, the Court finds that plaintiff's allegations against EAE trigger the commercial activity exception to foreign sovereign immunity, thus giving the Court subject matter jurisdiction over the airline. See Bazzy v. Royal Jordanian Airlines, 1992 WL 106381, at *2 (E.D.N.Y. May 7, 1992).

## II. Plaintiff's Claims Against Ethiopian Airlines

### A. *Standard for Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)*

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). The Supreme Court has elaborated on this plausibility standard, explaining that a complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This pleading

standard does not demand detailed allegations, but does require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In addition, the Court is mindful that it "remain[s] obligated to construe a pro se complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

### B.     *Montreal Convention*

The Montreal Convention,[2] which entered into force on November 4, 2003, "is a comprehensive international treaty of private international air law." Hutchinson v. British Airways PLC, 2009 WL 959542, at *3 (E.D.N.Y. Apr. 6, 2009). By its own terms, the Convention stresses the "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution," id. (citing preamble to Convention), which has led some to describe it as "a treaty that favors passengers rather than airlines." Ehrlich v. American Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004).

A "key provision of [the Convention] is its statement of preemptive effect." Paradis v. Ghana Airways Ltd., 348 F. Supp. 2d 106, 110 (S.D.N.Y. 2004). Article 29 of the Convention provides that "[i]n the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention." Accordingly, "the Montreal Convention has been construed has having a complete preemptive effect over all claims within its scope." Booker v. BWIA West Indies Airways Ltd., 2007 WL

---

[2]The official title of the Montreal Convention is the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on 28 May 1999, reprinted in S. Treaty Doc. No 106-45, 1999 WL 33292734 (2000).

9

1351927, at *2 (E.D.N.Y. May 8, 2007)

Defendant EAE argues that eight of plaintiff's state law counts are preempted by the Montreal Convention. EAE Opp. Br. at 12-13. Specifically, EAE notes that the essence of all of these claims relate to plaintiff's alleged loss of currency, loss of baggage, and delay resulting from EAE's failure to warn him about Ethiopia's currency laws and requirements. Id. The Court agrees that the bulk of plaintiff's claims are preempted by the Montreal Convention.

When "determining whether a claim is preempted because it falls within what the Supreme Court has termed the 'substantive scope' of the treaty, we are directed to look to the Convention's liability provisions." King v. American Airlines, 284 F.3d 352, 358 (2d Cir. 2002) (quoting El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 171-72 (1999)).[3] The Convention's liability provisions, in turn, "define[] three situations in which a carrier is liable: (1) death or bodily injury of passengers; (2) damage to baggage; and (3) delay of passengers, baggage and cargo." Booker, 2007 WL 1351927, at *4.

Plaintiff's state law claims against EAE for Conversion (Count IV), Unjust Enrichment (Count V), and Detrimental Reliance (Count XI), are all based on plaintiff's allegations that EAE lost his bag and caused his delay in Ethiopia. Article 17 of the Montreal Convention establishes liability for death and bodily injury of passengers, and the loss of, and damage to, checked baggage, while Article 19 establishes liability for damages due to delays caused by the air carrier. Therefore, inasmuch as these counts are based on allegations of these losses, plaintiff's claims

---

[3] Although King arose under the Warsaw Convention, "courts have previously relied on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same." Hutchinson, 2009 WL 959542, at *3 (internal citation omitted).

10

are preempted by the Montreal Convention.

While none of the substantive counts in plaintiff's amended complaint are based upon the Montreal Convention's liability provisions, plaintiff does state that his "action arises under the Treaties of the United States." Am. Compl. ¶ 6. Construing this pro se plaintiff's allegations liberally, as it must, the Court therefore deems some of plaintiff's claims as arising under the Montreal Convention.

### 1.   *Article 17(1)*

In his opposition to EAE's motion to dismiss, plaintiff argues that EAE is liable under Article 17(1) because EAE's alleged failure to warn him about Ethiopian customs laws constitutes an "accident" for purposes of Article 17(1) liability. To establish liability under Article 17(1), however, a plaintiff must claim to have sustained bodily injury. See, e.g., Booker, 2007 WL 1351927. Plaintiff has made no such allegation, and has therefore failed to state a claim under Article 17(1).

### 2.   *Article 17(2)*

Article 17(2) of the Convention establishes liability for loss or damage to checked baggage. Specifically, Article 17(2) provides that a "carrier is liable for damage sustained in the case of destruction or loss of, or damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place . . . during any period within which the checked baggage was in the charge of the carrier."

In light of the affidavits and photographs submitted by EAE in their opposition, which indicate that EAE currently possesses defendant's bag, defendant's claims that EAE lost his baggage seems unlikely. However, at this threshold stage in this litigation, the Court must

11

accept plaintiff's allegation as true. Thus, the Court reluctantly allows plaintiff's Article 17(2) claim to proceed with regard to his allegedly lost baggage.

However, the Court notes that Article 22(2) of the Montreal Convention limits the monetary liability of a carrier for lost baggage to 1,000 Special Drawing Rights, or approximately $1,500 except if the passenger has made a special declaration of interest in delivery at destination at the time he checks his baggage or if "it is proved that the damage resulted from an act or omission of the carrier, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result." Plaintiff has not alleged that he made a special declaration of interest in delivery. Nor has plaintiff alleged that EAE intended to cause him damage, or acted recklessly with knowledge that he would be damaged, in connection with his allegations underlying his claim for loss of baggage. Accordingly, the Court limits plaintiff's potential recovery to 1,000 Special Drawing Rights or approximately $1,500.

### 3.   *Article 19*

Article 19 of the Montreal Convention states that a "carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo." However, it further states that a carrier shall not be liable if it is proven that the carrier "and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was *impossible* for it or them to take such measures." (emphasis added).

Here, the "delay" alleged by plaintiff was no fault of EAE, but rather the Ethiopian government itself. Plaintiff does not allege that EAE failed to provide him the service he paid for, nor that any EAE employee prevented him from boarding his flight from Ethiopia to Nigeria. Instead, plaintiff alleges that Ethiopian immigration officials refused to let him leave Ethiopia.

12

When Ethiopian immigration eventually allowed plaintiff to leave, allegedly through the assistance of the Nigerian Embassy, EAE did in fact provide him air service, albeit after a $100 change fee.

Accordingly, the "delay" allegedly experienced by plaintiff was nothing of the kind, and was certainly not the fault of any EAE employee. As a result, plaintiff fails to state a claim under Article 19.

### C. Plaintiff's Remaining Allegations

The remainder of plaintiff's claims – for Conspiracy (Count I); Misfeasance (Count II); RICO violations (Count III); Vicarious Liability (Count VI); Willful Misconduct and Delay (Count VII); Breach of Duty of Good Faith and Fair Dealing (Count X); and Negligence (Count XII) – are all based on the same fundamental allegation; to wit, that EAE "did not, at any time prior to the journey or during the journey announce, nor inform the plaintiff of Ethiopian Banking and custom regulations, nor did they issue currency declaration forms to the plaintiff or any other passenger on through out [sic] the flight, and on approaching Ethiopia." Am. Compl. ¶ 22. Plaintiff further alleges that EAE "thus failed to perform an obligatory and customary requirement of informing the plaintiff of her laws, thereby deliberately leading the plaintiff to be entrapped by her service." Am. Compl. ¶ 33. Plaintiff asserts that "this notification requirement . . . . is the hallmark of all civilized nations," (Am. Compl. ¶ 34), and that if EAE had provided him customs materials or warned him about Ethiopia's customs regulations, this "would probably have prevented the seizure of money." Am. Compl. ¶ 57.

Plaintiff provides no authority or basis in law, nor does the Court find any support, for the proposition that an airline owes a duty to inform its passengers of the customs and immigration

13

laws of the countries to which it flies. Indeed, it is the passenger's obligation to acquaint himself with the relevant laws and regulations of foreign countries. Moreover, plaintiff is, by all accounts, a frequent international traveler, and it is beyond peradventure that he is unaware that customs forms and declarations are required to be filled out in most countries.

As EAE notes, its contract of carriage clearly states that all passengers "shall comply with Government travel requirements, [and] present exit, entry and other required documents." Decl. of Bekuremariam Getaneh, Ex. B. Plaintiff responds that he "did not receive an electronic ticket because the website of EAE malfunctioned," and that an "agent of EAE had to copy the necessary information and paste it on an email message to plaintiff." Pl. Opp. Br. at 9.

Even if the Court credits plaintiff's unlikely allegations regarding his ticket, they are of no matter, as EAE's Tariff Rule 55 provides similar provisions. Such tariffs, which airlines file with the Department of Transportation, "constitute the contract of carriage between passenger and airline and, if valid, conclusively determine the rights and liabilities between the parties." Clemente v. Philippine Airlines, 614 F. Supp. 1196, 1199 (S.D.N.Y. 1985) (internal citations omitted). Moreover, "a properly filed tariff is binding on a passenger, regardless of the passenger's actual knowledge of the tariff. Seisay v. Compagnie Nationale Air France, 1997 WL 431084 (S.D.N.Y. July 30, 1997) (internal citation omitted).

In this case, EAE's Tariff Rule 55 provides the following: "CARRIER IS NOT LIABLE FOR ANY DAMAGE DIRECTLY AND SOLELY ARISING OUT OF ITS COMPLIANCE WITH ANY LAWS OR WITH GOVERNMENTAL REGULATIONS, ORDERS, OR REQUIREMENTS, OR FROM FAILURE TO THE PASSENGER TO COMPLY WITH SAME." Decl. of Andrew Harakas, Ex. B. Therefore, even if plaintiff never received the

contract of carriage from EAE – an improbable allegation – EAE's on-file tariff precludes recovery.

Plaintiff was responsible for acquainting himself, and complying, with applicable Ethiopian customs regulations. EAE does not bear the responsibility of informing plaintiff of those regulations, and, accordingly, such allegations cannot form the basis for any of the remainder of plaintiff's common law claims. Furthermore, EAE's alleged failure to warn plaintiff of those regulations similarly fails to establish a viable RICO predicate.

Plaintiff's remaining claims are therefore dismissed pursuant to Fed. R. Civ. Pr. 12(b)(6).

## CONCLUSION

Plaintiff's claims against Ethiopia and EIC are dismissed for lack of subject matter jurisdiction. All of plaintiff's claims against EAE are dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), with the exception of his claim concerning his lost baggage, which survives under Article 17(2) of the Montreal Convention. However, the Court finds that any damages to be awarded for plaintiff's lost baggage are capped at 1,000 Special Drawing Rights, or approximately $1,500, as plaintiff has not alleged that he made a special declaration of interest in delivery or that EAE acted with the requisite intent or recklessness in purportedly losing his baggage.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge